ALL AMERICA CABLES AND
RADIO, INC., Appellant,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee,

Puerto Rico Telephone Company,
Intervenor.

ALL AMERICA CABLES AND RADIO,
INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

Puerto Rico Telephone Company,
Intervenor.

ALL AMERICA CABLES AND RADIO,
INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

Puerto Rico Telephone Company,
Intervenor.

ALL AMERICA CABLES AND
RADIO, INC., Appellant,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee,

Puerto Rico Telephone Company,
Intervenor.

Nos. 83–1252 to 83–1255.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 19, 1984.

Decided June 15, 1984.

Grant S. Lewis, New York City, with whom John S. Kinzey, Howard A. White and Theodore J. Fischkin, New York City, were on brief, for appellants in Nos. 83–1252 and 82–1255 and petitioners in Nos. 83–1253 and 83–1254.

Jane E. Mago, Counsel, F.C.C., Washington, D.C., with whom Bruce E. Fein, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and John E. Ingle, Deputy Associate Gen. Counsel, F.C.C., Washington, D.C., were on brief, for appellee, F.C.C., in Nos. 83–1252 and 83–1255 and respondents in 83–1253 and 83–1254. Barry Grossman and Frederic Freilicher, Attys., Dept. of Justice, Washington, D.C., entered appearances for appellee, U.S., in No. 83–1255 and for respondent in Nos. 83–1253 and 83–1254.

Before EDWARDS and STARR, Circuit Judges, and HAROLD H. GREENE,[*] United States District Judge for the District of Columbia.

Opinion for the Court filed by District Judge HAROLD H. GREENE.

Opinion concurring in part and dissenting in part filed by Circuit Judge STARR.

HAROLD H. GREENE, District Judge:

Petitioner All America Cables and Radio, Inc. (All America), which provides long distance telephone services to and from Puerto Rico, is seeking review of two companion orders issued by the Federal Communications Commission on January 20, 1983.[1] These orders resulted from applications filed by the Puerto Rico Telephone Company (PRTC), a local telephone company owned and operated by the government of Puerto Rico, which sought authorization from the Commission to displace All America as the long distance carrier between Puerto Rico and the United States mainland (Mainland), and between Puerto Rico and Canada.

In its first order, the Commission found that the relief requested by PRTC was not in the public interest, and it denied that carrier's application for control over All America's facilities which were providing service between Puerto Rico and the Mainland. At the same time, however, the Commission certified PRTC to compete with All America as an interstate and foreign carrier on the Puerto Rico Mainland route. *Puerto Rico Telephone Company*, —— F.C. C.2d ——, FCC 83–27, released February 8, 1983 (Mainland Order).[2] In the second or-

der, the Commission denied a PRTC request that it be substituted for All America with respect to service between Puerto Rico and Canada but, in an action similar to that in the Mainland Order, it authorized PRTC to acquire from All America twelve communications circuits and to use them to provide long distance service between Puerto Rico and Canada in competition with PRTC. *Puerto Rico Telephone Company*, F.C.C.2d ——, FCC 83–29, released February 8, 1983 (the Canada Order).[3]

The basic issue here is whether the Commission had the authority to certify PRTC so as to allow it to *compete* with All America in proceedings instituted and conducted to determine whether PRTC should *displace* All America in the Puerto Rico-Mainland and Puerto Rico-Canada markets. We find that the Commission lacked such authority and that its orders must be set aside as arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2)(A).[4]

## I

PRTC provides local telephone service to approximately 90 percent of the telephone subscribers in Puerto Rico.[5] Prior to the entry of the orders under review, the company was not authorized to render long distance service which was provided exclusively by All America and its affiliate, ITT Communications, Inc.-Virgin Islands (ITT). All America and ITT owned, maintained, and operated all the facilities dedicated to overseas service to and from Puerto Rico, including a satellite earth station, microwave transmission facilities, and submarine cables.

---

[*] Sitting by designation pursuant to 28 U.S.C. § 292(a).

[1] See sections 402(a), (b) of the Communications Act, 47 U.S.C. § 402(a), (b); see also 28 U.S.C. § 2344.

[2] J.A. 1–20.

[3] J.A. 503–514.

[4] See *N.L.R.B. v. Blake Construction Co.*, 663 F.2d 272, 279–83 (D.C.Cir.1981); *Rodale Press, Inc. v. FTC*, 407 F.2d 1252, 1256 (D.C.Cir.1968);

*Connecticut Light & Power Co. v. NRC*, 673 F.2d 525, 533 (D.C.Cir.1982); *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1031 (D.C.Cir.1978); and see, *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 288 n. 4, 95 S.Ct. 438, 443 n. 4, 42 L.Ed.2d 447 (1974); see also, 5 U.S.C. § 554(b)(3).

[5] At one time PRTC was a subsidiary of All America. In 1974 all of PRTC's stock was sold to the Puerto Rico Telephone Authority, a public authority created by the Commonwealth of Puerto Rico, and the Commonwealth now owns PRTC.

On December 21, 1978, PRTC filed an application with the FCC seeking authorization under section 214 of the Communications Act, 47 U.S.C. § 214, to displace All America as Puerto Rico's long distance carrier.[6] The application set forth a detailed proposal for a revision of the methods by which communications services were provided among Puerto Rico, the Mainland, and the U.S. Virgin Islands. PRTC requested that, as part of that revision, it be allowed to combine under its control both interstate and intrastate transmission and service, and to become substituted for All America with respect to the interstate operations.

It was the theory of PRTC's application that All America and ITT functioned as mere middlemen between PRTC and its off-island counterparts. PRTC described the division between its local service and All America's long distance service between Puerto Rico and the off-shore points as "arbitrary" and "[a] fragmentation of responsibility for operating these facilities [which] is anachronistic and inefficient."[7] PRTC claimed that its plan would improve the quality of the overall communications network serving Puerto Rico.

Consistent with these purposes, the PRTC plan did not contemplate the construction of new, competitive transmission facilities. PRTC explained that the construction of such facilities would not be in the public interest because the existing equipment of All America and ITT was adequate to serve Puerto Rico's long distance needs[8] and because such construction would not be economically efficient.[9] Rather, PRTC sought an order from the FCC requiring All America and ITT to transfer to it the ownership of their existing facilities.[10]

On April 2, 1979, All America moved for a denial of PRTC's Mainland application, arguing, *inter alia*, that the applicant was in effect requesting All America's decertification as a long distance carrier,[11] and that PRTC's proposal would violate the Commission's policy favoring private over government ownership of the facilities used to provide commercial communications services.[12]

Two years later, on May 12, 1981, while the Mainland Application was still pending, PRTC filed an application for direct service between Puerto Rico and Canada. This objective was to be achieved, again, by the displacement of All America.[13] PRTC proposed to lease from All America and AT & T first eight, and later twelve, circuits between San Juan and New York as well as connecting facilities between New York and the Canadian border. PRTC stated that it expected to handle directly over ninety percent of the Puerto Rico-Canada

6. The specific telephone services covered by PRTC's application were MTS ("Message Toll Service," that is, ordinary long distance service) and WATS ("Wide Area Telephone Service," essentially a discounted long distance service for high volume users).

7. J.A. 28.

8. PRTC stated that
the existing facilities [of All America and ITT] through which this service is presently provided are not considered inadequate and, indeed, are the very same facilities in which PRTC wishes to acquire IRU interests.
J.A. 83.

9. PRTC also proposed a reconfiguration of the routing of Puerto Rico's long distance traffic, and it asked that it be permitted to replace All America as AT & T's correspondent for long distance services to Puerto Rico.

10. This was to be accomplished by the transfer of indefeasible right of use, or IRU, interests. Such interests provide a way for communications carriers which had not invested in an ownership share prior to circuitry activation to obtain a right to acquire capacity and to insert investment costs into its rate base.

11. According to All America, the Commission lacked statutory jurisdiction to grant such relief, and that even if it had such authority, it lacked the factual record necessary for such a grant.

12. With the filing of opposition and reply briefs, the record was complete as of May 10, 1979.

13. No carrier had previously had a direct correspondent arrangement for telephone service between those two areas. All Puerto Rico-Canada traffic was carried through the facilities of the Trans Canada Telephone System, AT & T, All America, and PRTC.

traffic and to take care of any remaining traffic through PRTC-controlled overflow routings to AT & T and All America.

All America again opposed PRTC. It reasserted the decertification objection, and it identified a number of alleged technical and economic deficiencies, particularly with regard to PRTC's plan to use All America for its overflow traffic.[14]

On January 20, 1983, the FCC issued both the Mainland and the Canada orders. With respect to the former, the agency accepted All America's argument that PRTC's application was a proposal to decertify All America as a long distance carrier, and it found such decertification not to be in the public interest. Said the Commission:

> PRTC is requesting the Commission to give it the major portion of the off-island market and, in effect, decertify [All America] and authorizing PRTC to merely step into [All America's] shoes.... [W]e find that no public interest benefits will result from forcing [All America and ITT] to sell IRUs in the circuitry requested by PRTC.[15]

The Commission did not limit itself to that determination, however. Instead, it decided to treat the application as a request for new entry into a monopolized market, and on that basis it certified PRTC as an interstate and foreign carrier allowed to compete with All America.[16] Primarily on the basis of the policy determination it had made earlier with respect to competition generally in *MTS and WATS Market Structure*, 81 F.C.C.2d 177 (1980),[17] the Commission found that PRTC's competitive entry into off-island markets was reasonably feasible and in the public interest. The Commission also applied to this proceeding the *MTS/WATS* rule which imposes upon those opposing entry by a new carrier the burden of showing by clear and convincing evidence that competition would not be in the public interest,[18] and it concluded that All America had not met that burden.[19]

On the same day that it rendered the Mainland decision, the Commission also issued an order on the Canada application, authorizing PRTC to acquire and operate all twelve of the requested circuits[20] for Puerto Rico-Canada operations. The basis for this order were for all intents and pur-

---

**14.** All America noted that

PRTC does not contend, and the Commission should not be deluded into thinking, that this application has anything to do with competition .... In both [an earlier proceeding and in the Mainland Application], PRTC has advocated that it should totally replace [All America] for Puerto Rico-U.S. Mainland telephone service....

J.A. 582–83. An opposition to All America's petition to deny was filed on July 20, 1981, a reply on August 6, 1981, and with the submission of several letters, the record was complete in July 1982.

**15.** J.A. 13.

**16.** The Commission recognized that PRTC had no automatic right to acquire IRU interests in All America's various off-island facilities, and it therefore did not prescribe what facilities should be made available or on what terms and conditions, leaving such matters to negotiation between the parties. In order to ensure PRTC's right of access to off-island facilities, the FCC also abrogated all provisions in the AT & T-All America-ITT contract requiring exclusive dealing in off-island traffic.

**17.** The Commission acknowledged that Puerto Rico was not "specifically" included within the scope of the *MTS/WATS* decision. However, it found that the considerations which are applicable to the Mainland, Hawaii, and Alaska apply also to Puerto Rico. J.A. 11.

**18.** Absent the presumption which the FCC drew from *MTS/WATS*, PRTC would have had the burden of proof. 47 C.F.R. § 63.01; *American Tel. & Tel. Co.*, 88 F.C.C.2d 1630, 1648 (1982).

**19.** The Commission further conceded the existence of a policy preference for private ownership and operation of communication facilities, but it concluded that All America had not demonstrated that PRTC's advantages due to its status as a government-owned entity frustrated the goals of competition.

**20.** Because of a number of lingering questions concerning PRTC's proposal for overflow routing, the Commission did not authorize such routing, but it promised to act on the appropriate section 214 application for such routing, and it directed All America to cooperate with PRTC in working out an appropriate plan.

poses identical with those relied on for the Mainland Order. The Commission again cited *MTS/WATS*, and it again observed that All America had not met its burden under that decision.[21]

## II

In authorizing PRTC to compete with All America, the Commission granted applications which were not before it. PRTC's section 214 applications were bids to take over All America's monopoly of service between Puerto Rico and the Mainland and Canada. Those applications, as well as PRTC's replies to All America's petitions to deny, make no reference to the possibility of competition or the implications of a competitive market in the Puerto Rican framework. Moreover, the pleadings and the evidence before the Commission·could not have reasonably been regarded by anyone as framing issues with request to a competitive entry into a monopolized market.

It was the premise of PRTC's Mainland application that the separation between local service and long distance MTS and WATS service was arbitrary, anachronistic, and inefficient. To remedy this situation, PRTC proposed to acquire control of All America's off-island facilities in order to "transfer" to it the responsibility of the operation of those facilities; to "combine" in PRTC intrastate and interstate transmission and service; to "eliminat[e]" the All America middleman role; and to "substitute" PRTC for All America as the carrier responsible for the interstate transmission of traffic.[22] In short, PRTC sought to acquire and merge All America's long distance monopoly with its own monopoly in local service and to become the sole carrier for both types of service.

In spite of this very clear framing of displacement issues, and only displacement issues, the FCC, after denying PRTC's re-

quest for the acquisition of the All America monopoly, went on to authorize PRTC instead to compete with All America in the Puerto Rican off-shore market. The Commission has offered basically two reasons for its decision to consider and decide the issue of competition in a displacement case, but in our view neither justifies the agency's action.

First. The FCC characterizes its decision as an exercise of its power to grant part of a section 214 application. It is the Commission's view that the PRTC application for the displacement of All America contemplated in theory a two-step request and process—the first a request for certification to provide the services, the second a request for the displacement of All America. As the Commission saw it, it simply decided to grant only the first part of PRTC's application.

This kind of a theoretical splitting of the PRTC application not only appears to have no precedent in Commission history, but as a rationalization for the agency's conduct it makes no practical or regulatory sense. As explained in Part III *infra*, the issues to be decided in a competition proceeding differ widely from those which govern the resolution of a proceeding for the displacement of one monoply carrier by another. That defect is not cured by a metaphysical division of an actual application into two theoretical parts.

Indeed, section 214(c) itself provides no authority for the grant of the kind of "partial relief" the Commission asserts it granted here. That provision grants to the Commission the power to issue a certification "for a portion or portions of a *line or extension*"; it makes no reference to the grant of a portion or portions of an *application* along the lines of the split posited by the Commission in these cases.

---

**21.** In response to All America's decertification argument, the Commission commented that that company's fear of competitive dislocation by PRTC was unfounded in view of its control of off-island transmission facilities, the pre-existing operating agreements with foreign correspondents and its corporate ties with ITT. The

Commission also found that All America filed its revised tariff reducing its rates for Puerto Rico-U.S. Virgin Islands-Canada telephone service, at least in part, as a result of PRTC's application to provide service to Canada.

**22.** J.A. 29–30, 32, 35, 87.

Second. The Commission claims that the issue of competition had already been decided in *MTS/WATS* and was therefore properly applied in these cases. There are several problems with that argument.

In the first place, as the FCC has recognized (see note 17 *supra*), Puerto Rico was not specifically included within the scope of the *MTS/WATS* rulemaking proceedings. In view of that concession, it is dubious that Puerto Rico services could have been deemed controlled by *MTS/WATS*.[23] In any event, the Commission's assertion, without elaboration, that it found that the same considerations applied to Puerto Rico as to the Mainland[24] is without any evidentiary or other support. The Commission provided no explanation for the basis on which it was making such a finding and, as will be seen *infra*, the Puerto Rican application in fact presented a number of issues quite different from those decided in *MTS/WATS*.

Moreover, the *MTS/WATS* decision was issued long after the pleading cycle in the Mainland proceeding had already closed. The Puerto Rico cases could not be validly decided on the basis of a subsequent ruling which was not known to the parties when their pleadings and proof were presented to the agency and when there are obvious differences between the two situations. See Part III *infra*. It can certainly not.be assumed that All America would not have offered evidence and argument bearing upon the issues as they ultimately became clear from the *MITS/WATS* decision had that decision preceded the close of the pleading cycle in the instant proceedings.[25] More particularly, All America could not reasonably be expected to meet the eviden-

tiary burden imposed by *MTS/WATS* when that decision was not announced until a year after the evidentiary record here had already been closed.

### III

These defects were not technical or formalistic; they had significant consequences in terms of the representations All America was able to make and the conclusions the FCC could legitimately draw.

First. While no doubt competition in the telecommunications industry is as a general matter in the public interest,[26] that may or may not be true in specialized situations such as that presented by service between Puerto Rico and the United States mainland and Puerto Rico and Canada. The Commission itself has previously recognized such distinctions. Thus, in *Phase II of MTS/WATS*, 92 F.C.C.2d 787, 82–515 (1982), it applied the procompetition policies to communications to and from Alaska only following a separate inquiry into the special factors that might distinguish such communications from those in the contiguous States. See also, note 23 *supra*.

In *Hawaiian Telephone Company v. FCC*, 498 F.2d 771 (D.C.Cir.1974), this Court observed that competition is not to be equated automatically and in all circumstances with the public interest, and that, when considering a section 214 application, the Commission

> must start from the situation as it then exists, and must apply the statutory standard to determine whether indeed the public convenience and necessity requires more or better service .... [T]hen it can consider how much added service is necessary, and finally to whom

---

**23.** See *Competitive Carrier Rulemaking*, 85 F.C.C.2d 1, 40 n. 95, 45 (1980) where the Commission decided not to apply various regulatory policies to offshore points, including Puerto Rico, "because we are not yet convinced that there are no specific policy, legal, economic or facility program issues involved in service to the offshore points which require individual consideration."

**24.** J.A. 11 n. 23.

**25.** Although the Canada record closed after the issuance of the *MTS/WATS* decision, All America had no cause to adduce competition evidence in that proceeding on account of *MTS/WATS* because competition—the crux of that decision—was not an issue here.

**26.** See *United States v. AT & T*, 552 F.Supp. 131 (D.D.C.1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983).

the opportunity for providing service should be awarded.[27]

For that reason, too, we noted in *Telocator Network of America v. FCC,* 691 F.2d 525, 544 (D.C.Cir.1982), that when the Commission contemplates allowing competitive entrance into a particular market, it

must be able reasonably to forecast, first, that new entry will not so severely impair the economic base of existing carriers that the industry would experience an incidence of failure so high as to impair provision of service to the public, and, second, that injection of new providers will probably result in better, cheaper, or more innovative communications offerings. These forecasts must have some ascertainable foundation in the record.

In order to make such forecasts, the Commission would have to engage at least in enough factfinding to define the relevant market, analyze its present make-up and status, and make predictions as to likely changes following the introduction of competition. Examination of existing and proposed routing arrangements and the nature of existing facilities may also be required to determine the feasibility of allowing new entrants into the market.[28]

Second. Even more important than the competition question in the abstract is that relating to the form of the competition. Normally, as the Commission recognized in *MTS/WATS,* the hallmark of a competitive marketplace is the maximization of consumer choice. See *Phonetele, Inc. v. AT & T,* 664 F.2d 716, 722 n. 10 (9th Cir.1981). That, however, was not the kind of competition the FCC had in mind for Puerto Rico. There, said the Commission, because PRTC "has a virtual monopoly on local Puerto Rico telephone service ... certification will

not result in customer choice of off-island carriers at this time." [29] The FCC envisioned instead only competition among off-island carriers for the provision of facilities to PRTC. In its view, such carrier competition "may eventually" lead to customer choice of off-island carriers.[30]

Since there was no evidence before the Commission on this issue, it is difficult to determine whether such a market would, in fact, operate competitively even as that concept was defined by the FCC. However, if anything, the record contradicts even this modest assumption. PRTC asserted that the construction of new facilities would be uneconomical and not in the public interest. If that is true, then there would be no carrier competition—the first step in the FCC's scenario. Nor is it obvious who the "other carriers" would be who would compete with All America since that company is presently the only one providing off-island service.

Third. The market the FCC envisaged depends entirely upon the grant by PRTC of the requests of competitors for equal non-discriminatory access to its local monopoly facilities. There is a serious question whether the requirement of equal access in section 201(a) of the Communications Act, 47 U.S.C. § 201(a), would be sufficient to generate such access as to prevent PRTC's establishment of a monopoly with the incentive and the ability to charge exorbitant rates. Certainly that has not been the experience on the Mainland. It has often been alleged, and sometimes proved, that with respect to the Mainland the refusal of the Bell System's local carriers, notwithstanding section 201(a), to grant to long distance carriers adequate access arrangements at reasonable cost was the principal obstacle to the implemen-

---

**27.** See also *FCC v. RCA Communication, Inc.,* 346 U.S. 86, 94–95, 97, 73 S.Ct. 998, 1004, 1005, 97 L.Ed. 1470 (1953).

**28.** To be sure, as the Supreme Court said in *FCC v. RCA Communications, Inc., supra,* 346 U.S. at 96, 73 S.Ct. at 1005, the Commission "is not required to make specific findings of tangible benefit," that is, it need not engage in "detailed forecasts." The agency must still demonstrate,

however, "that there [is] ground for reasonable expectation that competition may have some beneficial effect." 346 U.S. at 97, 73 S.Ct. at 1005.

**29.** J.A. 15–16.

**30.** J.A. 16.

tation of the Commission's competitive policies.[31] It could well be that, instead of providing such access, PRTC would choose instead to exploit its monopoly power to the detriment of All America and future entrants into the long distance market, if any.

Even if competition did arise among long distance carriers with respect to the provision of facilities to PRTC, that local monopolist would have no real incentive to pass any savings along to the public. Moreover, once PRTC acquired as many circuits as it required, it might be expected to use its control over the routing of all long distance traffic to divert traffic from any other long distance carriers to its own lines.[32] PRTC could then charge monopoly rates, and customer choice would continue to be a chimera.[33]

In short, it was not known to the FCC, and because of the fact that the proceedings before the Commission did not address the issue of competition, it is still unknown whether conditions exist in Puerto Rico which promise a greater likelihood of success with respect to equal access under section 201(a) than was achieved on the Mainland.[34]

Fourth. Related to the issue of equal access is the public ownership question. As indicated, there is a general Commission policy against public ownership of long distance services. The Commission summarily concluded in these proceedings that All America had failed to demonstrate why that policy should here be applied. What

that conclusion misses is that public ownership is especially relevant in a competitive situation. Equal access to competitors has a greater chance of being achieved if the particular monopoly is regulated by an independent body. PRTC, as a government corporation, is not regulated by Puerto Rico at all. Thus, the failure of the Commission to provide All America with the opportunity to contest the public ownership question in the framework of a competitive environment left a void which casts further doubt on the agency's conclusions.

Fifth. By allowing the combination of local and long distance service in one company, the Commission created a market structure fundamentally inconsistent with the manner in which the rest of the American telecommunications industry is being restructured. The evolving national policy has been one of keeping local telephone companies, with their monopoly of local exchange services, out of the competitive long distance market. See *United States v. AT & T, supra.* It may conceivably be that Puerto Rico presents special considerations which militate against the adoption of that policy there. However, at a minimum, the Commission had an obligation to provide All America with an opportunity to argue, and to provide evidence, to support the view that the Puerto Rico market was not to be treated in this respect unlike telecommunications on the Mainland.

Sixth. The Commission treated its Canada Order as nothing more than an exten-

**31.** See, *e.g., MCI Telecommunications Corp. v. FCC (Execunet),* 561 F.2d 365 (D.C.Cir.1978).

**32.** PRTC conceded in its Mainland Application that "competition cannot efficiently be developed through construction of additional transmission facilities." J.A. 71.

**33.** The Commission provides no explanation at all of how competition would operate in the Puerto Rico-Canada market. It merely asserted in its Canada Order that All America's fear of competitive dislocation by PRTC was unfounded in view of its "control of off-island transmission facilities, its pre-existing operating arrangements with foreign correspondents and its corporate ties with ITT." J.A. at 510. This statement is incorrect since the Commission actions

awarded to PRTC the right to acquire IRU interests in the facilities of All America and required modification of All America's operating agreement with AT & T. Given PRTC's ability to control the routing of off-island traffic, All America's ownership of facilities, its contract with AT & T, and its ties to ITT are all largely meaningless. As a result of the Commission's actions, PRTC would have the capacity to carry all the Canada traffic, and it would have the ability, because of its local monopoly, to route all such traffic to the facilities which the Commission has awarded to it.

**34.** In addition, it may be that interconnection with PRTC's facilities will be technically difficult to accomplish in any event due to their antiquated nature.

sion of the Mainland Order, and it made no effort to identify and treat issues, such as those relating to ownership and interconnection policies, that may be unique to the international market.[35] The Commission not only did not confront the issue of the possible effect of such special considerations, but it did not even inquire into their existence.

We raise these issues not to suggest any particular answer, or even that each of them must necessarily be considered in detail, but only to indicate the sorts of concerns the Commission would have had to address before it could grant PRTC's application as it was fundamentally modified by the agency. These are all issues which have a bearing only, or primarily, on competition, as distinguished from the substitution of one carrier for another. The Commission's conversion, without notice, of the PRTC application from one for monopoly service to one for competitive service precluded consideration of these matters, and the agency's decision must therefore be set aside as arbitrary, capricious, and not in accordance with law. See note 4 *supra.*[36]

## IV

PRTC and the FCC argue that All America had several opportunities to be heard at the agency level on the question of competition and that, having failed to avail itself

of these opportunities, it cannot be heard to complain to this Court.

The first opportunity, it is said, occurred at the time of the *MTS/WATS* inquiry, which, according to PRTC, included the Puerto Rico interstate market. However, the Commission itself has recognized that Puerto Rico was not specifically included within the scope of the *MTS/WATS* decision and that the policies of that prior decision were being extended to Puerto Rico for the first time. See text to notes 23–24 *supra.* It is difficult to see on what basis PRTC can be faulted for not having raised issues concerning Puerto Rico in a general proceeding which dealt only with Mainland questions.

PRTC and the FCC claim next that All America could and should have supplemented its pleadings after the competition issues in MTS/WATS were decided. The simple answer is that All America had no cause to do so because the issue of competition was not pending before the Commission in the instant proceeding, and All America had no reason whatever to anticipate that it would nevertheless be considered by the Commission.

Finally, PRTC and the FCC argue that All America should have petitioned for reconsideration of the Mainland and Canada Orders pursuant to section 405 of the Com-

---

**35.** For example, the Mainland Order, as noted, relied primarily upon the *MTS/WATS* decision, but that decision did not include international competition within its scope.

**36.** The dissent suggests that PRTC's Mainland application, properly understood, consisted of two parts: a section 214 request for certification and a request under sections 201 and 202 for facilities, and that this should have alerted All America to the possibility that the Commission would grant relief limited to the issue of competition. To the extent that sections 201 and 202 are mentioned in the record at all, it is in the context of enforcement following the grant of an application under section 214. See, *e.g., J.A.* 15. The May 1, 1979 filing to which the dissent refers did not change this picture, for it, too, suggested no more than that these statutory provisions were available in the event that All America refused to sell the facilities PRTC wished to acquire. Indeed, PRTC acknowledged in that filing that if its application were granted, All America would lose its existing au-

thority to carry MTS and WATS traffic originating and terminating in Puerto Rico, and it would retain only such collateral authority as that over foreign MTS, telex and message traffic, and private line services (J.A. 358–59). The short of it is that prior to the Commission's order, literally no one in the administrative process, including PRTC, considered that the PRTC application was not one for the displacement of All America, whether on account of the existence of sections 201 and 202 or otherwise.

As for the observation of our dissenting colleague that our view "swallows hook, line and sinker All America's characterization of the PRTC application as a request for 'All America's decertification as a long distance carrier'" (Dissent at 761), it may be noted that the Commission's order likewise described that application as one for the "displacement" of All America (J.A. 8) and as a request to "decertify" that company (J.A. 13).

munications Act, 47 U.S.C. § 405, after these orders were entered.[37]

As both PRTC and the Commission concede,[38] section 405 does not always require a petition for reconsideration as a prerequisite to judicial review. Nor are circumstances present in these cases which should cause us to decline to consider the substantive issues because such a petition was not filed.

All America's points here are not technical or intricate in the sense that agency expertise may be required. All America contends that the Commission violated due process and the Administrative Procedure Act because of its misconception, based upon an erroneous understanding of general legal principles, on the proper approach to and the resolution of the PRTC applications. The Commission has made clear that it believes that it had the legal authority to decide what it did and in the manner it did. It would be highly artificial to deny All America judicial review simply because it did not file one additional paper with the Commission when there is not the slightest reason to believe that a petition for reconsideration would have caused a shift in the Commission's view of its powers. See *Action for Children's Television v. FCC*, 564 F.2d 458, 469 (D.C.Cir.1977).

Nor would we be justified in dismissing these appeals on exhaustion grounds if we were to assume, *arguendo*, that the Commission now feels that perhaps it should have provided notice and developed a fuller record on the issue of competition. With the cases in their present posture, it simply would make no sense for the Court to refuse to entertain the arguments of All America—which on this hypothesis are correct by the FCC's lights—because that company came here instead of going again to the Commission. In any event, the Commission's failings were so basic that we would not be justified in protecting it from

judicial scrutiny unless a petition for reconsideration were clearly mandated. That, as indicated, is not the case. *Action for Children's Television v. FCC, supra.*

V

CONCLUSION

For the reasons stated, the Mainland Order and Canada Order are vacated, and the cases are remanded to the Federal Communications Commission for further proceedings not inconsistent with this opinion.

*So ordered.*

STARR, Circuit Judge, concurring in part and dissenting in part:

I respectfully dissent in Nos. 83–1252 and 83–1253, for two reasons. First, I disagree with the majority's characterization of the applications filed by Puerto Rico Telephone Company ("PRTC") and with the understanding as to the meaning of those applications which the majority credits to All America Cables and Radio, Inc. ("All America"). Second, I cannot agree that the order of the Federal Communications Commission granting the PRTC's Mainland application was so unsupported as to be arbitrary and capricious.

I

The majority describes PRTC's Mainland application as one for "authorization under section 214 of the Communications Act ... to displace All America as Puerto Rico's long distance carrier." Majority Opinion at 754. This view of the Mainland application swallows hook, line and sinker All America's characterization of the PRTC application as a request for "All America's decertification as a long distance carrier ...." *Id.* at 754. It is certainly true that All America reasonably could have construed the Mainland application, *standing*

---

**37.** 47 U.S.C. § 405 provides in pertinent part: The filing of a petition for rehearing shall not be a condition precedent to judicial review of any such order, decision, report, or action, except where the party seeking such review ... relies upon questions of fact or law upon

which the Commission ... has been afforded no opportunity to pass.

**38.** See Brief for Intervenor PRTC at 30; Transcript of Proceedings at 21.

*alone,* to be a request to "displace" All America "as Puerto Rico's long distance carrier." What I am frankly unable to divine is how All America could reasonably have stuck to this view of PRTC's application *after* its receipt of PRTC's filing on May 1, 1979. There, PRTC took pains to point out that "[t]he concept of 'involuntary decertification' is one of [All America's] own invention." Joint Appendix (JA) at 357. Further, PRTC asserted that

> By couching its argument in these terms, [All America] evidently seeks to distract the Commission from the clear and legitimate purposes of PRTC's Application. Of course, PRTC's Application says nothing about "decertification," voluntary, involuntary, or otherwise. *On the contrary, PRTC seeks an affirmative grant of authority from the Commission.*

JA at 357–58 (emphasis added). PRTC then explained the "affirmative grant" it was seeking:

> In focusing on what it alleges that PRTC is asking the Commission to do with [All America], [All America] ignores the Commission's affirmative authority to grant a certificate of public convenience and necessity ... pursuant to section 214. Moreover, [All America] completely misses the point that *to the extent* that a grant of PRTC's Application *might require* the Commission to take any action vis-a-vis [All America], that limited action would be taken pursuant to sections 201 and 202....

JA at 361–62 (emphasis added).

In my view, PRTC's May 1, 1979 filing clearly placed All America on notice as to PRTC's theory that the Mainland application sought certification under section 214. Anything beyond certification would, in turn, have to be dealt with under sections 201 and 202. Rather than dealing squarely with the issues thus framed, All America in

reply to the PRTC filing addressed PRTC's invocation of the Commission's "affirmative authority" under section 214 only to the extent of deeming it "totally misleading," JA at 426, and contrary to All America's construction of section 214. *Id.* at 463–65.

All America's dogged insistence on reading the Mainland application as an "all or nothing" gambit by PRTC is drawn seriously into question by the fact—recognized by All America in its FCC filings [1]—that the Commission had "never ordered the transfer of the major incidents of line ownership from an existing carrier-owner to a new competitor, as [the Mainland application] asks ...." Mainland Order at 13, JA at 13. Given the unprecedented nature of the actions requested by PRTC under sections 201 and 202 vis-a-vis All America, it is difficult indeed to see how an enterprise as experienced as All America could fail to recognize the clearly indicated *possibility* that the Commission might grant only that portion of the Mainland application seeking section 214 certification.

In light of these circumstances, All America's failure to address the competitive impact of a grant of section 214 authority to PRTC is more easily understood as a deliberate, strategic litigating decision than as the result of All America's being blindsided by the competition issue. Given the pendency of the *MTS/WATS* proceeding [2]—which, while not addressing the special case of Puerto Rico, clearly signalled a new Commission interest in competitive MTS markets—All America had good reason for *wanting* to avoid the question whether Puerto Rico should have competitively delivered long distance service. This strategic interest, however, cannot justify the skillful "shell game" which All America appears to have played with considerable

---

**1.** In its Petition to Deny, All America argued that PRTC's application sought "relief which, to our knowledge, is unprecedented in the 45-year history of the Communications Act." JA at 219.

**2.** The initial notice of inquiry and proposed rulemaking in *MTS/WATS* was released in early

March 1978. *See MTS and WATS Market Structure,* 67 F.C.C.2d 757 (1978). The Mainland application was filed on December 21, 1978, and All America's petition to deny was filed on April 2, 1979.

panache and success.[3] All America should simply not now be heard to argue that "the FCC granted PRTC relief on a theory never raised in the pleadings," All America Brief at 30, or that "the FCC impermissibly broadened the scope of [the Mainland] proceeding." *Id.* at 29.

The majority moves from its ready acceptance of All America's characterization of the Mainland application to a critical analysis of the FCC order granting it. This analysis merits our careful examination. The majority identifies two basic reasons given by the Commission "for its decision to consider and decide the issue of competition in a displacement case," and concludes that "neither justifies the agency's action." Maj. Op. at 756.

The majority first rejects the Commission's explanation that it decided to grant only the section 214 request contained in the Mainland application, and deny PRTC's requests under sections 201 and 202. The majority states that "[t]his kind of theoretical splitting of the PRTC application not only appears to have no precedent in Commission history, but as a rationalization for the agency's conduct it makes no practical or regulatory sense." Maj. Op. at 756. The reasoning underlying this analysis turns on the majority's quite reasonable view that "the issues to be decided in a competition proceeding differ widely from those which govern the resolution of a pro-

ceeding for the displacement of one monopoly carrier by another." *Id.* at 756. But this analysis, with all respect, begs the question whether the Commission had an adequate record on which to grant the section 214 authorization, a question to which we will momentarily return.

Further, the majority's characterization of the "metaphysical division of an application into two theoretical parts" relies to some considerable extent upon a selective reading of the literal language of section 214(c). The majority asserts, with emphasis in the original, that

> [S]ection 214(c) itself provides no authority for the grant of the kind of "partial relief" the Commission asserts it granted here. That provision grants to the Commission the power to issue a certification "for a portion or portions of *a line or extension*"; it makes no reference to the grant of a portion or portions of an *application* along the lines of the split posited by the Commission in these cases.

Maj. Op. at 756. As we noted above, this case appears to present a question of first impression with respect to the scope of the FCC's authority under section 214. The majority's rather cavalier treatment of the Commission's claim of authority under this section flies in the face of the deference rightly owed by the Article III branch to an agency's construction of its organic statute.[4] *Columbia Broadcasting Sys., Inc. v.*

---

**3.** Tellingly, All America has made the tactical decision not to seek FCC reconsideration of the Mainland Order. This decision, however, conflicts with 47 U.S.C. § 405 (1976), *see* Maj.Op. at 761 n. 37, which provides that a petition for rehearing is a prerequisite to judicial review in cases involving "questions of fact or law upon which the Commission ... has been afforded no opportunity to pass." In this case, the FCC has had no opportunity to meet All America's argument that competition issues were not in fact before the FCC in the Mainland proceeding. Given All America's skillful avoidance of the competition issues in the Mainland proceeding, it is extraordinarily difficult to conclude, as the majority does with beguiling ease, that "there is not the slightest reason to believe that a petition for reconsideration would have caused a shift in the Commission's view of its powers." Maj.Op. at 761. A full briefing of this point before the FCC could, at a bare minimum, *conceivably*

have changed the Commission's view of this matter. Clearly, the FCC would thereby have had the opportunity to address the precise argument advanced here by All America and embraced by the majority. In consequence, today's ruling does not well serve the salutary interests of orderly administrative proceedings and judicial review fully informed by the exhaustion of procedures carefully framed by the Congress.

**4.** It should be of some interest that the majority presses its view of FCC power under section 214 even further than does All America. *Compare* Maj.Op. at 756 ("section 214(c) itself provides no authority for the grant of the kind of 'partial relief' the Commission asserts it granted here") with All America Reply Brief at 4 ("[w]hatever the scope of the FCC's authority to grant applications in part, it is not extensive enough to permit the FCC to dispense with due process").

*Democratic National Committee,* 412 U.S. 94, 121, 93 S.Ct. 2080, 2095, 36 L.Ed.2d 772 (1973); *Red Lion Broadcasting Co., Inc. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1795, 1801, 23 L.Ed.2d 371 (1969). Under elementary principles, the question is not whether this court can devise a reading of the statute more to its liking; it almost always can. Rather, the agency's interpretation should be upheld "unless there are compelling indications that it is wrong . . . ." *Columbia Broadcasting, supra,* 412 U.S. at 121, 93 S.Ct. at 2096; *Red Lion, supra,* 395 U.S. at 381, 89 S.Ct. at 1802. Given the scope of section 214, it cannot be said that the majority has identified such "compelling indications." In particular, the majority appears to have overlooked language in that section providing that the FCC may issue a certificate "for the partial exercise only of such right or privilege . . . ." This language seems to me to confer upon the Commission ample authority to approve the Mainland Order in the fashion it did.

The majority next attacks the second leg of support claimed by the Commission: "that the issue of competition had already been decided in *MTS/WATS* and was therefore properly applied in these cases." Maj.Op. at 757. Here the majority is on sounder ground. I fully agree that the Commission acted improperly in applying the *MTS/WATS*[5] outcome retroactively to cover the Mainland application and pleading cycle. But that does not end the matter for me. Denying the Commission recourse to *MTS/WATS* as justification for its order here simply should not sound the death knell for the Commission's determination as to where the public interest lies. Indeed, the majority implicitly concedes as much by noting that the Commission based its decision "[p]rimarily" on the *MTS/WATS* decision. There were in fact other considerations informing the Commission's decision to grant PRTC's application. Given the record before the Commission, and the clear consideration of these factors as reflected in the Mainland Order, I cannot in conscience conclude that the Commission's action here descended to the depths of arbitrary and capricious conduct.

Quite to the contrary, the Commission thoroughly considered PRTC's qualifications to provide off-island telephone service. It concluded that "PRTC has the operational, technical and financial capabilities to enter off-island markets without a diminution of existing service." Mainland Order at 10, JA at 10. The Commission further determined that the fact that PRTC is a government-owned entity would not entail unfair competitive advantages. *Id.* at 11. The FCC, moreover, plainly considered the feasibility of new entry into the off-island telephone service market. After reviewing traffic data submitted by PRTC and other information as to traffic growth in the U.S.-Puerto Rico and U.S.-Virgin Islands markets, the Commission "conclude[d] that there is sufficient off-island traffic to support another off-island carrier." *Id.* at 12.

Finally, the Commission addressed the competitive impact of PRTC's entry. In addition to its inappropriate reliance upon *MTS/WATS,* the Commission determined that the introduction of new competition into the provision of off-island transmission facilities would benefit the public. This new competition was perceived as increasing the incentives for both All America and PRTC to respond more fully to the needs of telephone customers in Puerto Rico. *Id.* at 16. Certification of PRTC would enable it, in the Commission's view, to seek the most efficient facility routing to the U.S. mainland through direct interconnection with AT & T, a development which would "facilitate line coordination, maintenance, and investment decision-making." *Id.* The FCC concluded that this "managerial and operational flexibility will lead to lower rates and better quality services for Puerto Rico residents." *Id.*

Against these findings, the majority deploys a parade of horribles, stemming from a presumed inability on the part of the Commission and the courts to hold PRTC to its duty under section 201, in the event it

---

5. *MTS and WATS Market Structure,* 81 F.C.C.2d 177 (1980).

enters the off-island market, to provide access to its facilities to All America and possible future competitors. The concern as expressed by the majority is that "PRTC would choose instead to exploit its monopoly power to the detriment of All America and future entrants into the long distance market, if any." Maj.Op. at 759. Further, the majority states that "once PRTC acquired as many circuits as it required, it might be expected to use its control over the routing of all long distance traffic to divert traffic from any other long distance carriers to its own lines." *Id.* at 759.

It is clear beyond cavil that the competitive dynamic envisoned by the Commission would take some time to achieve. It simply could not happen overnight. In the meantime, the possibility of abuse by PRTC would exist. However, if PRTC sought to exploit its short-run power in this market, All America and other potential competitors would likely waste little time and spare no resources in petitioning the Commission, pursuant to section 201, for fair access to PRTC's facilities. Moreover, if, pursuant to the Mainland Order, PRTC sought unfair access to All America's facilities, it could reasonably be expected that All America would see fit to stand its ground and contest the fairness *vel non* of the arrangement sought by PRTC under the standards of section 201.

In short, I am not troubled at this early stage of the process by the future possibility of abuse, given the existence of an express substantive provision and a specialized forum for the challenge of such abuses, if and when they arise. Indeed, we not infrequently refuse to entertain on grounds of ripeness and finality challenges to agency action which has not yet developed into the direct injury anticipated with dread by the regulated entity. *See, e.g., Tennessee Gas Pipeline Co. v. FERC*, 736 F.2d 747, (D.C.Cir.1984); *Air New Zealand Ltd. v. CAB*, 726 F.2d 832 (D.C.Cir.1984). It thus

sounds a discordant jurisprudential note to overturn agency action on grounds of possible future evils as to which the agency has been duly equipped by Congress with weaponry to combat. Perhaps we again need to be reminded of the admonition, which obtains powerfully in the setting of judicial review of administrative action, that sufficient unto the day is the evil thereof.

## II

It is clear that the Canada Order depends entirely upon the efficacy of the Commission's order in the Mainland proceeding. Inasmuch as the majority has seen fit, notwithstanding the analysis set forth in Part I above, to reverse the Commission entirely in Nos. 83–1252 and 83–1253, the predicate for the Canada Order is thus thereby eliminated.

In light of the majority's conclusion in that respect, I concur in the remand with respect to the Canada proceeding, particularly since the Commission's order in that proceeding went further than simply granting PRTC certification under section 214(c). Rather, the Commission, in effect, directed All America to lease to PRTC twelve circuits under the terms of an existing tariff. *See* Canada Order at 11, 13, JA at 512, 514, and PRTC Brief, Appendix A. The consequence of the Canada Order became clear in the course of oral argument; PRTC now handles virtually *all* of the Puerto Rico-Canada traffic. A clean sweep by PRTC as to off-island traffic was clearly not contemplated by the FCC with respect to the Mainland market. *See* JA at 18. Thus, the practical effect of the Canada Order renders it considerably more vulnerable than the more limited Mainland Order.[6]

## III

In sum, I find the Commission's Mainland Order to be a fair and well-reasoned

---

**6.** In their briefs and during oral argument, All America, PRTC, and the Commission devoted scant attention to the Canada Order. This sketchy treatment does not provide a suitable

basis for a full consideration of this Order, and suggests again that the Canada Order is a mere sidelight to the centerpiece of this appeal—the Mainland Order.

attempt to introduce competition into the market for long-distance service to Puerto Rico. Moreover, I am considerably less pessimistic than the majority about the efficacy of section 201 in deterring and frustrating any attempt PRTC might eventually be tempted to make to exploit its monopoly position in the market for local services. But in any event the majority's opinion will presumably delay only for a while Puerto Rico's introduction to competition in long-distance telephone service to the Mainland market now monopolized by All America.

